Magistrate Judge Benton

FILED
LODGED
ENTERED
RECEIVED

JAN - 5 2007

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

07-MJ-00007-CMP

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SUNG HONG,<br>aka LAWRENCE HONG<br><br>Defendant. | MAGISTRATE'S DOCKET NO.<br>CASE NO. 07 - 007 M<br><br>COMPLAINT for VIOLATION<br><br>Title 18, United States Code,<br>Sections 1951(a) and 1343 |

BEFORE the Honorable Monica J. Benton, United States Magistrate Judge, Seattle, Washington.

## Count 1
### Extortion

On or about October 10, 2005, at Kirkland, within the Western District of Washington, SUNG HONG, also known as LAWRENCE HONG, did knowingly obstruct, delay, and affect commerce in any way and degree by extortion through which he obtained property, that is, $500,000, from another person with that person's consent that was induced by the wrongful use of threatened force, violence, and fear, in violation of Title 18, United States Code, Section 1951(a).

## Count 2
### Wire Fraud

On or about September 12, 2005, within the Western District of Washington, SUNG HONG, also known as LAWRENCE HONG, having devised a scheme and artifice to defraud,

COMPLAINT/SUNG HONG - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 and to obtain money by means of false and fraudulent pretenses, representations, and

2 promises, did knowingly cause approximately $25,000 to be transmitted by means of wire in

3 interstate commerce for the purpose of executing such scheme and artifice, in violation of

4 Title 18, United States Code, Section 1343.

5

6 The undersigned complainant, being duly sworn, states:

7      1.      I, Patrick Garry have been a special agent of the FBI for over ten months. I am

8 responsible for investigating violations of federal criminal statutes over which the FBI has

9 investigative jurisdiction, including titles and sections regarding extortion and wire fraud.

10      2.      I make this affidavit in support of a Complaint charging SUNG HONG, also

11 known as LAWRENCE HONG, with Interference With Commerce by Extortion and Wire

12 Fraud. The statements contained in this affidavit are based on my own investigation and the

13 investigation of other FBI agents and information related to me by others personally or in

14 written reports.

15 **Interviews with "WS"**

16      3.      On February 22, 2006, FBI Special Agent Joseph Quinn and I interviewed a

17 person whose intials are WS. I subsequently interviewed WS on a number of occasions

18 regarding his dealings with HONG. WS advised that HONG induced WS to part with a total

19 $800,000. The following is a summary of the information provided by WS:

20      4.      WS met HONG in the summer of 2005. WS lived next door to HONG in an

21 apartment along the waterfront of Lake Washington. HONG resides at 6427 Lake

22 Washington Boulevard NE, Kirkland, Washington. The two shared a mutual interest in

23 boating and quickly became friends. HONG told WS that he was an experienced investor in

24 stock, bonds, and commodity futures. HONG suggested that WS open a futures trading

25 account with him.

26      5.      WS transferred $50,000 to HONG on August 8, 2005 as part of an investment

27 partnership between WS and HONG, doing business as H&H GROUP, INC. HONG

28 promised that WS's investment would be matched dollar for dollar by HONG and that the

COMPLAINT/SUNG HONG - 2

1   profits would be split equally between them.  HONG also promised that the money would be

2   transferred to a joint U.S. Bank account and that WS could have his money returned upon

3   demand.  Both HONG and WS signed a written agreement regarding this investment

4   partnership.  WS provided a copy of this agreement dated August 8, 2005.

5         6.     On September 9, 2005, WS transferred another $250,000 to HONG as part of

6   the investment partnership to trade a variety of futures and stocks.  HONG was to deposit

7   $1,000,000 into the trading account and profits were to be split equally.  HONG was required

8   to return WS's funds upon demand.  HONG and WS signed a second agreement in September

9   to reflect the additional investment.  WS made additional transfers to HONG of $100,000 on

10  September 13, 2005, $65,000 on September 19, 2005, and $35,000 on October 11, 2005.

11  These additional transfers were offset by a return of $200,000 to WS's daughter on October

12  11, 2005.

13        7.     WS advised that HONG promised to set up a trading account to trade a variety

14  of futures and stocks and that WS and WS's daughter would be "joint tenants" on the account.

15  HONG had also represented to WS that he was an experienced investor, that he had a made a

16  significant amount of money in Korea, that his father-in-law was the finance minister of South

17  Korea and that he had access to secret information regarding the trading strategies of large

18  international investors, including entities owned or controlled by international financier

19  George Soros.  By mirroring the trading practices of these investors, and through his

20  relationship with the Korean Finance Minister, HONG promised that he would be able to

21  make virtually risk-free investments with WS's money.

22        8.     At the point when WS's overall payments to HONG were $300,000, WS was

23  completely out of cash and began to ask HONG to return some of his money to pay for living

24  expenses.  HONG told WS that their money was actually tied up with a powerful international

25  crime syndicate, referred to as "The Clan," and that it was impossible to get their money

26  returned to them.  HONG stated that if HONG returned any of the funds to WS, then both

27  HONG and WS would be killed by "The Clan."  WS advised that HONG repeated these

28  threats many times.

COMPLAINT/SUNG HONG - 3

9.      Furthermore, HONG told WS that their families were now in danger, including WS's daughter, and that WS had to come up with an additional $500,000 within five days. HONG told WS that if WS did not come up with the additional funds, both WS and WS's daughter would be tortured and murdered. Fearing for his own safety and the safety of his daughter, WS wired the additional $500,000 to HONG on October 10, 2005. WS had to borrow the money to make this payment. This brought WS's total transfers to HONG up to $800,000. Both WS and HONG signed an agreement reflecting the additional funds.

10.      HONG also told WS that they were constantly being watched by "The Clan" and that they could not tell anyone about their situation without putting their families at risk. HONG said that "The Clan" knew the make of the car that WS rented in Hawaii and the place where WS was staying. HONG provided those specific details to WS as an example of the reach and power of "The Clan." HONG told WS that their houses were bugged and that "The Clan" knew everything that they did.

11.      During the first week of January, 2006, WS's girlfriend confronted WS about the money he had transferred to HONG. The following morning, WS told his therapist the whole story and his therapist told WS that he had been conned. WS advised that it was at this point that he realized that he had been deceived by HONG.

12.      WS was able to freeze funds in the H & H GROUP Penson account through a temporary restraining order issued by the United States District Court, Western District of Washington on January 30, 2006. Eventually, WS recovered $283,677.17 that remained in the H & H GROUP Penson accounts.

13.      WS and his therapist confronted HONG about his activities. HONG initially denied any wrongdoing but then admitted to WS that he took advantage of him. HONG admitted that "The Clan" story was a falsehood and apologized for his actions. HONG also told WS that he would pay WS back. The following day, WS and his therapist met HONG and his family at HONG's house to discuss how HONG would repay WS. HONG's mother, Hyo S. Hong, told WS that they knew that they owed the money and that they just needed some time to get the money from Korea. WS's therapist confirmed that HONG admitted he

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  made up the story about "The Clan" and that WS and WS's daughter were not really in

2  danger. WS's therapist also confirmed that HONG apologized and promised WS to return his

3  money.

4      14.    WS advised that he was interviewed by an Associated Press reporter and that a

5  story regarding his dealings with HONG was published in February of 2006.

6  **Written Agreements Between HONG and WS.**

7      *15.    WS provided a copy of the agreements signed by HONG dated August 8, 2005*

8  and September 9, 2005. On August 8, 2005, HONG initially entered into a written agreement

9  with WS in which HONG made the following representations:

> i.     HONG promised to manage the funds and make investment decisions
>        with the approval of WS. The agreement states that HONG is doing
>        business as H&H GROUP, INC.
>
> ii.    HONG represented that WS's contribution would be invested in futures
>        and stocks.
>
> iii.   HONG represented that WS's contribution would be matched by an equal
>        contribution from HONG.
>
> iv.    HONG represented that he would make only secure investments that
>        would limit losses to 10% of the original amount invested.
>
> v.     HONG promised to liquidate WS's share and return his money upon
>        demand.

21     16.    WS advised that HONG and WS entered into a second agreement on September

22  9, 2005 in which HONG made the following representations:

> i.     HONG promised to deposit $1,000,000 into a trading account with
>        Penson Financial in the name of H&H GROUP while WS and WS's
>        daughter would deposit between $350,000 and $500,000 into the
>        partnership. HONG also represented that he would loan the account
>        $500,000 to bring WS's share up to $1,000,000.
>
> ii.    HONG represented that WS's contribution would be invested in futures

*COMPLAINT/SUNG HONG - 5*

1    and stocks.

2    iii.    HONG promised to return WS's funds upon demand.

3    iv.    HONG represented that he would sign a note and deed of trust on his

4           home on Lake Washington Boulevard in the amount of $500,00 as

5           security for WS's investment. HONG represented that there were no

6           additional liens or mortgages against his home at 6427 Lake Washington

7           Boulevard NE and that there was adequate equity to protect WS's note

8           and deed of trust.

9    17.    WS and HONG completed an addendum at the end of the second agreement that

10   specifies the amount transferred by WS to be $800,000: "As of 10/10/05 this agreement no

11   longer includes [WS's daughter], and the amount invested is now $800,000, by [WS]."

12   18.    Also, WS provided a copy of a receipt signed by HONG which acknowledges

13   that HONG received a total of $800,000 from WS and states that, "These funds are only to be

14   used for investment in stocks [and] futures in Lawrence's on-line trading account with Penson

15   Financial Services."

16   **Recorded Conversations**

17   19.    Because of the threats against his family, WS began to secretly record his

18   conversations with HONG prior to his contact with the FBI. On February 22, 2006, WS

19   provided a copy of these recordings to myself and SA Quinn. The recordings discuss "The

20   Clan" and the threat the organization posed to WS and his daughter. At one point in a

21   recording made in January, 2006, HONG told WS, "...cuz you got tied up eight hundred

22   thousand...You know how at one point, you know, you were so tired and you said, 'F---, I just

23   want to pull out'? The reason why that's a no-no, and you know it, is because we'd be dead.

24   And you know this... They're not gonna let us go." HONG also said, "If I just needed solely

25   just the eight hundred thousand, I have partners that I could partner with for the money's

26   sake... That's not it, I got you in this because ... I need you right now."

27   20.    Throughout the recordings, HONG frequently mentions the threat posed by

28   "The Clan" and their inability to get their money out of the investment partnership due to this

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  threat. The recordings contain numerous references to "The Clan" and describe what will

2  happen to WS and his family if WS talks to anyone about "The Clan" or attempts to get his

3  money returned. HONG told WS it would be a "slaughterhouse" and that everyone who is

4  associated with them is in danger. HONG stated that "Because of what we're doing, I know

5  three people for sure... or make it four: my mom, Young, [your daughter] and Don... Those

6  four I don't think will ever be safe, if you and I ever screwed up... They will not take a chance

7  on blood or family..." .

8       21.     On February 25, 2006, I supervised a recording between WS and HONG. This

9  recording took place after WS had confronted HONG about his activities and after the

10  newspaper article regarding HONG's dealings with WS was published. HONG told WS that

11  he wanted to do a refinance on his house and have the money in place before he told WS

12  "what really happened." HONG said "What I did to you was already hard enough for me for

13  three months... That's the reason I couldn't sleep." HONG told WS that his $800,000 was

14  "guaranteed" and that "Your eight hundred is gonna be given to you in one form or another."

15  During this recording, HONG indicated that he did not want to talk about "The Clan." HONG

16  stated that "I don't know what got into me... It seems like, unfortunately, I believed into it

17  too." HONG made other comments to WS explaining that he was afraid of "The Clan" too.

18  When questioned why he would put WS under such stress by mentioning the threat of "The

19  Clan," given WS's heart condition, HONG said, "Maybe I didn't think straight on that... I

20  don't know what to say to you... Believe it or not it kinda stressed me out too... Even if it may

21  be just ...an urban legend thing, I was worried too, for myself." In the recording, HONG

22  states that threat of The Clan "wasn't a way of like me getting money out of ya." At one

23  point, WS asked HONG, "Do you think that I would have given you the five hundred

24  thousand, if I wasn't worried about The Clan killing me?" and HONG replied "I don't know. I

25  think ... some of the predictions I gave you were so accurate, that if you planned on doing it, I

26  think you would have done it anyway." In the recorded conversation Hong admitted that his

27  father-in-law was not really the Finance Minister of South Korea as represented to WS when

28  HONG induced WS to invest funds with H & H GROUP.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 | **Bank Records Analysis**

2 |     22.    I have reviewed copies of the financial records and financial analyst reports

3 | generated from bank records for HONG's checking account number ********1263 with U.S.

4 | Bank as well as his trading account number ****2825 with Penson Financial.  The records

5 | show that funds WS provided to HONG were deposited into HONG's U.S. Bank account, and

6 | that all funds HONG paid to WS were paid from the U.S. Bank account.  In addition, HONG

7 | transferred some of the money provided by WS from the U.S. Bank account to his brokerage

8 | account at Penson Financial and transferred some of the Pension Financial money back to the

9 | U.S. Bank account.

10 |     23.    HONG's U.S. Bank account shows that HONG deposited check number 5184

11 | from WS for $50,000 on August 9, 2005.  This corresponds to WS's check number 5184 for

12 | $50,000 made payable to H&H GROUP INC on August 8, 2005.  The memo portion of the

13 | check reads "Investment in Hong Partnership."

14 |     24.    HONG's U.S. Bank account shows that HONG did not deposit money from any

15 | other source into his U.S. Bank account in August and that, on August 22, 2005, HONG only

16 | wired $24,000 into his trading account with Penson Financial.  HONG's bank records show

17 | that HONG dissipated the remaining funds in his U.S. Bank account, writing personal checks

18 | amounting to $21,209.29, including check number 2178 for $1,000 dated August 15, 2006

19 | and made payable to Hyo S. Hong, SUNG HONG's mother, making ATM and debit card

20 | withdrawals of $3,415.94 and making miscellaneous withdrawals of $1,923.04.  Furthermore,

21 | HONG wired $6,000 back from his trading account with Penson Financial to his checking

22 | account with U.S. Bank on September 1, 2005.

23 |     25.    WS provided copies of the checks made payable to H&H GROUP or

24 | LAWRENCE SUNG HONG, dated in September 2005, totaling $415,000.  These checks

25 | included check number 5186, dated September 9, 2005, in the amount of $250,000 and made

26 | payable to "Lawrence Sung Hong," check number 5187, dated September 13, 2005, in the

27 | amount of $100,000 and made payable to "H&H Group, Inc.," and check number 5189, dated

28 | September 19, 2005, in the amount of $65,000 and made payable to "H&H Group, Inc."

COMPLAINT/SUNG HONG - 8

1  HONG made corresponding deposits into his U.S. Bank account in September in the amounts

2  of $250,000 on September 9, 2005, $100,000 on September 13, 2005, and $65,000 on

3  September 19, 2005.  HONG's U.S. Bank records confirm that WS's checks are the source of

4  HONG's deposits which total $415,000.00.

5      26.     Bank records show that, on  September 14, 2005, HONG transferred $290,000

6  into his Penson trading account. HONG's U.S. Bank account activity in September shows a

7  beginning balance of $47.17, deposits totaling $415,000, other deposits totaling $8,120, a

8  transfer of $290,000 to HONG's trading account with Penson Financial, debit card

9  withdrawals (including ATM withdrawals, ATM fees, and debit card usage) of $9,402.84,

10  miscellaneous withdrawals of $38,661.82, and checks paid for personal items amounting to

11  $45,853.48.

12      27.     HONG's September expenses included a $25,000 wire made on September 12,

13  2005 to Aurora Loan Services, which services HONG's home loan.  The funds were

14  transmitted via interstate wire from U.S. Bank in Seattle, Washington to the Aurora Loan

15  Services account with JP Morgan Chase Bank in New York.

16      28.     HONG also wired $9,825.17 to Aurora Loan Services on September 14, 2005.

17  HONG paid Jaguar Credit $860.00 on September 13, 2005 and paid Mercedes Benz

18  $2,802.99 on September 14, 2005.  HONG also wrote check number 5162 for $10,000, dated

19  September 27, 2005 and made payable to Hyo S. Hong, SUNG HONG's mother.

20      29.     On August 19, 2005, immediately prior to WS's initial $50,000 transfer to

21  HONG, the balance in the H & H Group Penson account was $2,399.74 in cash and stock

22  options valued at $6,500.  The total value of HONG's Penson account was $8,899.74 as of

23  August 19, 2005.  The balance in HONG's futures account with Penson on August 19, 2005

24  was zero.  Since August 20 through August 21 was a weekend, the balance of $8,899.74

25  remained the same through August 21, 2005.

26      30.     From August 21, 2005 to February 14, 2006 HONG made the following

27  deposits into his Penson account:

28      08/22/05     $24,000      From HONG's U.S. Bank Account

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

| | | | |
|---|---|---|---|
| 1 | 09/15/05 | $290,000 | From HONG's U.S. Bank Account |
| 2 | 10/27/05 | $350,000 | From HONG's U.S. Bank Account |
| 3 | TOTAL | $664,000 | |

31.    From August 21, 2005 to February 14, 2006 HONG made the following withdrawals from his Penson account:

| | | | |
|---|---|---|---|
| 6 | 09/1/05 | $6,000 | To HONG's U.S. Bank Account |
| 7 | 11/28/05 | $15,000 | To HONG's U.S. Bank Account |
| 8 | 12/01/05 | $10,000 | To HONG's U.S. Bank Account |
| 9 | 12/09/05 | $5,000 | To HONG's U.S. Bank Account |
| 10 | 12/19/05 | $12,000 | To HONG's U.S. Bank Account |
| 11 | 12/23/05 | $3,000 | To HONG's U.S. Bank Account |
| 12 | 12/29/05 | $15,000 | To HONG's U.S. Bank Account |
| 13 | 01/03/06 | $25,000 | To HONG's U.S. Bank Account |
| 14 | 01/10/06 | $5,000 | To HONG's U.S. Bank Account |
| 15 | 01/13/06 | $5,000 | To HONG's U.S. Bank Account |
| 16 | 01/17/06 | $11,000 | To HONG's U.S. Bank Account |
| 17 | 01/20/06 | $61,000 | To HONG's U.S. Bank Account |
| 18 | TOTAL | $173,000 | |

32.    HONG used funds on deposit with Penson to trade securities.

33.    Based on my review of bank records and financial analysts reports generated from bank records, I believe that HONG used substantial portions of WS's funds for personal expenditures.  Furthermore, the analysis of U.S. Bank records and the Penson account records indicates that from August 21, 2005 to February 14, 2006, $664,000 was transferred by HONG to the Penson account via interstate wire.  In addition HONG transferred $173,000 via interstate wire from the Penson account to HONG's U.S. Bank account.

34.    From August 21, 2005 to February 28, 2006, records from Hong's U.S. Bank account show that HONG depleted all of the funds in the account with the exception of $1,282.55.  These expenses included: five payments to Aurora Loan Services totaling

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

$64,852.88, check number 2162 for $10,000 payable to HONG's mother, Hyo S. Hong, two checks totaling $19,780.85 payable to Centrum Financial, three checks totaling $29,914.12 payable to Equity Funding, check number 2125 payable to the King County Treasury for $10,264.04, debit card payments of $31,565 to Tulalip Casino, debit card payments of $4,180.97 to Muckleshoot Casino, a debit card payment of $4,896 to Tiffany & Company, other ATM withdrawals of $16,523.93, two payments to Mercedes-Benz totaling $5,605.98, check number 2446 payable to William, Kastner & Gibbs for $10,000, check number 2253 payable to the Han Sarang Church for $10,000, a wire to the law firm of Hall, Zanzig, Zulauf in the amount of $50,000, a wire to Mi Yae Park in the amount of $15,000, other checks totaling $81,648.72.

35.    HONG's U.S. Bank records show the following transfers between HONG and WS and/or WS's daughter:

| | | | |
|---|---|---|---|
| 08/09/05 | $50,000 | Deposit | Check #5184 from WS |
| 09/09/05 | $250,000 | Deposit | Check #5186 from WS |
| 09/13/05 | $100,000 | Deposit | Check #5187 from WS |
| 09/19/05 | $65,000 | Deposit | Check #5189 from WS |
| 10/10/05 | ($5,988) | Withdrawal | Check #2229 payable to WS |
| 10/10/05 | $400,000 | Deposit | Check #503773139 - from WS |
| 10/11/05 | $500,000 | Deposit | Wire from WS |
| 10/11/05 | $35,000 | Deposit | Check #5191 from WS |
| 10/11/05 | ($200,000) | Withdrawal | Transfer to WS's daughter |
| 10/14/05 | ($203,000) | Withdrawal | Transfer to WS |
| 01/15/06 | ($10,000) | Withdrawal | Check #2450 payable to WS |
| 06/19/06 | ($1,500) | Withdrawal | Check #2270 payable to WS |
| TOTAL | $979,512 | | Net Deposits to HONG's U.S. Bank account. |

**HONG's Association with H & H Group.**

36.    A internet search of the Washington Secretary of State database showed that

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   SUNG HONG of 6427 Lake Wash Blvd NE, Kirkland, Washington is the registered agent for

2   H&H GROUP.  Senior Investigator John Cipriani of  the U.S. Commodities Futures Trading

3   Commission (CFTC) provided account application documents for Penson Financial that show

4   HONG to be the President and Director of H&H GROUP.

5

6   **Conclusion**

7        37.    Based on the above, I believe there is probable cause to believe that SUNG

8   HONG, also known as LAWRENCE HONG, committed acts in violation of Title 18, United

9   States Code, Sections 1951(a) and 1343.

10

11

12                                          PATRICK J. GARRY
                                            Special Agent, Federal Bureau of Investigation

13

14        Based on the Complaint and Affidavit sworn to before me, and subscribed in my

15   presence,  the Court hereby finds that there is probable cause to believe the defendant

     committed the offenses set forth in the Complaint.
16
          Dated this _____5_____ day of January, 2007.
17

18

19

20                                          MONICA J. BENTON
                                            United States Magistrate Judge
21

22

23

24

25

26

27

28

COMPLAINT/SUNG HONG - 12